KLEIBER v. THE PEOPLE'S RAILWAY COMPANY *et al.*, *Appellant.*

IN BANC.

1. **Railroad**: NEGLIGENCE: APPREHENSION OF DANGER. One placed in a position of peril by the negligence of another is not required to exercise the discretion and judgment necessary if such condition did not exist.

2. ——: ——: ——. To entitle one to recover for injuries received in endeavoring to escape from peril occasioned by another's negligence, it must appear, *first*, that the alarm was caused by defendant's negligence; *second*, that the apprehension of peril from plaintiff's standpoint was reasonable, and, *third*, that the appearance of danger was so imminent as to leave no time for deliberation.

3. ——: ——: ——. The danger must be determined by the circumstances as they appeared and not by the fact that if plaintiff had not sought to escape the threatened danger no injury would have resulted.

4. ——: ——: ——. The evidence examined and *held* to show no negligence as to one defendant, but to justify the submission of the question of the negligence of the other defendant to the jury.

5. ——: ——: EVIDENCE. Evidence of the acts of passengers and of the outcries of them and bystanders was admissible as part of the *res gestœ* and as showing that plaintiff was actuated by reasonable apprehension in jumping from the car.

Kleiber v. The People's Ry. Co.

*Appeal from St. Louis City Circuit Court.*—Hon.
G. W. Lubke, Judge.

Affirmed.

*Hitchcock, Madill & Finkelnburg* for the People's
Railway Company, appellant.

(1) The trial court erred in refusing this defend-
ant's instruction of nonsuit, offered at the close of all·
the evidence. There was absolutely no evidence of neg-
ligence on the part of this defendant or any of its
employes. Under the facts, as shown by the testimony,
the case should not have been submitted to the jury.
*Maschek v. Railroad,* 71 Mo. 276; *Jackson v. Hardin,*
83 Mo. 175; *Hunt v. Railroad,* 89 Mo. 607; *Holman v.
Railroad,* 62 Mo. 562; *Railroad v. Wallen,* 65 Tex.
568. (2) The court erred in not setting aside the
verdict as against this defendant ( the People's Railway
Company), because it was apparent, in view of the evi-
dence before the jury and the instructions given them
by the court, that the jury disregarded said instructions,
and wholly disregarded the evidence in rendering a joint
verdict against both defendants. The verdict as to this
appellant was directly against the evidence and against
the law as laid down by the court. Where the verdict
is manifestly against the evidence and the instructions,
the supreme court will interfere and reverse judgment.
*Ackley v. Staehlin,* 56 Mo. 558; *Hearne v. Keath,* 63
Mo. 84; *Schmieding v. Young,* 57 Mo. 78; *Whitsett v.
Ransom,* 79 Mo. 258; *Cary v. Railroad,* 60 Mo. 209.
The supreme court will grant new trial when verdict is
so clearly against weight of evidence that it must have
been the result of passion or prejudice. *Hipsley v.
Railroad,* 88 Mo. 348. Though one witness denies facts
stated by another, so that facts are not undisputed, appel-
late court is not prevented from interfering if disputed
facts, even if proved, do not tend to support verdict.

*Douglas v. Orr*, 58 Mo. 573. (3) The court erred in refusing this defendant's instructions, numbered 1, 2 and 3. They contain fundamental propositions of law governing cases of this kind and should have been given to the jury. (4) The court erred in permitting plaintiff and other witnesses to answer questions as to how other passengers acted and looked, and whether others in the car ' jumped, or changed their position. The question was whether this plaintiff acted properly, and this cannot be determined by showing the conduct of others. This testimony was incompetent and irrelevant. (5) The court erred in permitting witnesses to be asked how far the bell of the locomotive could be heard. This defendant had a right to rely on the proper management of the gates as a guide, and the court so instructed the jury. *Speed v. Railroad*, 71 Mo. 304. (6) Plaintiff's counsel erroneously influenced the jury by an argument not justified by the testimony. (7) The damages ($4,000) awarded by the jury in this case are manifestly excessive and indicate that the jury was prejudiced against the defendants. (8) The supreme court, on appeal, may reverse or affirm the judgment of the trial court, or give such judgment as 'it thinks the trial court should have given. It may also reverse a judgment as to one of two appellants and affirm it as to the other.

*Bennett Pike* for Missouri Pacific Railway Company, appellant.

*Rassieur & Schnurmacher* for respondent.

(1) When one is placed in a situation of peril by the negligence of another, his attempt to escape danger, even by doing an act which is also dangerous, and from which injury results, will not prevent a recovery, if the attempt was one, such as an ordinarily prudent person might make under the like circumstances. Beach on Contributory Negligence, p. 43; Whittaker's Smith on

Negligence, p. 392, and note ; *Nelson v. Railroad*, 68 Mo. 593 ; *Twomley v. Railroad*, 69 N. Y. 158 ; *Buel v. Railroad*, 31 N. Y. 314 ; *Wilson v. Railroad*, 26 Minn. 278 ; *Stokes v. Saltonstall*, 13 Pet. 181 ; *Coal Co. v. Healer*, 84 Ill. 126 ; *Frink v. Potter*, 17 Ill. 406 ; *Karr v. Parks*, 40 Cal. 188 ; *Lund v. Inhabitants*, 11 Cush. 563 ; *Cook v. Parkham*, 24 Ala. 21. ( 2 ) And the foregoing is the rule, even though the person would not have been injured at all, had he not made the attempt to escape the threatened danger. *Twomley v. Railroad*, 69 N. Y. 158 ; *Buel v. Railroad*, 31 N. Y. 314 ; *Railroad v. Mowery*, 36 Ohio St. 418 ; *Wilson v. Railroad*, 26 Minn. 276 ; *Smith v. Railroad*, 30 Minn. 169 ; *Schultz v. Railroad*, 44 Wis. 638 ; *Gunz v. Railroad*, 52 Wis. 672 ; *Railroad v. Rhodes*, 56 Ga. 645. ( 3 ) And the question in such case is not what a prudent person under ordinary circumstances would have done ; for the shock, the suddenness of the emergency, the excitement and the influence of fear and terror should all be taken into account ; cool presence of mind cannot be expected. Beach on Contributory Negligence, p. 44, and cases cited ; *Siegrist v. Arnot*, 86 Mo. 200 ; *Adams v. Railroad*, 74 Mo. 553. ( 4 ) Therefore, what other persons did, or what they said by way of exclamation, may be given in evidence to show what may have been reasonably prudent under the circumstances. *Twomley v. Railroad*, 69 N. Y. 158 ; *Railroad v. Fay*, 16 Ill. 558 ; *Railroad v. Ashcroft*, 48 Ala. 15. ( 5 ) Both demurrers to the evidence were properly overruled. The record will disclose that the situation of peril from which plaintiff tried to free herself was brought about by the carelessness, as well of the watchman of the one defendant, as of the driver of the other. Where an injury is occasioned by the concurring negligence of two persons, the negligence of the one will be no defense to the other. The injured party may hold either, or both liable. Whittaker's Smith on Negligence, p. 31, and cases cited. ( 6 ) The instructions must be read together ;

Kleiber v. The People's Ry. Co.

and their meaning is not to be collected from detached instructions, or from phrases in them. If, when so treated, their meaning is obvious and the legal principles announced correct, they are safe guides for a jury, even though open to verbal criticism. *State v. Mathews,* 98 Mo. 125; *Vinegar Co. v. Guggemos,* 98 Mo. 391; *Bank v. Hatch,* 98 Mo. 376; *Reilly v. Railroad,* 94 Mo. 600; *State v. Grayor,* 89 Mo. 600. And when read together the instructions in this case placed the issues fairly before the jury. (7) The damages were not excessive. To determine them is peculiarly the province of a jury; this court has even refused to disturb the verdict where it would have been better satisfied had the amount been less. *Whalen v. Railroad,* 60 Mo. 323.

*Hough & Hough,* also, for respondent.

(1) The law does not require, in a case of this kind, that the apparently impending peril shall be a real peril; but if the defendants, by a combination or concurrence of confusing circumstances and threatening surroundings, brought about by them or either of them, calculated to produce a high state of mental excitement and terror in a reasonably prudent person, and apparently requiring instant decision and action on the part of plaintiff to escape personal injury therefrom, caused the plaintiff, acting as a reasonably prudent person, to perform an act, in so attempting to escape such apparently impending injury, productive of injury to himself, then the defendant or defendants, as the case may be, are liable for such injury. *Stokes v. Saltonstall,* 13 Peters, 181; *Coal Co. v. Healer,* 84 Ill. 126; *Jones v. Boyce,* 1 Stark. 402; *Twomley v. Railroad,* 69 N. Y. 158. (2) And if two carriers jointly contribute to produce such excitement and terror and consequent action on the part of plaintiff, then both are liable for the injury thereby occasioned. *Flaherty v. Railroad,* 39 Minn. 328. And the negligence of the carrier on

which the plaintiff was a passenger will not be imputed
to the plaintiff.　*Little v. Hackett*, 116 U. S. 366 ; *Becke
v. Railroad*, 102 Mo. 548.　( 3 )　Evidence of the action
of the other passengers was competent as a part of the
*res gestæ*, and, also, as evidence of what was deemed
prudent by those in the same situation having an
interest to take the least, and avoid the greatest, hazard.
*Railroad v. Fay*, 16 Ill. 558 ; *Railroad v. Ashcraft*, 48
Ala. 15 ; *Twomley v. Railroad*, 69 N. Y. 158.　( 4 )　The
flagman should have closed the gate and prohibited the
passage of all vehicles when he had notice that an engine
was coming ; and that he had notice is shown by his
act in partially closing the gate, and his exclamation to
" get out of there " and to " hurry up ; " and he should
not have partially closed the gate and then raised it,
and told the driver to hurry up and go across.　*Peck v.
Railroad*, 50 Conn. 379.　( 5 )　The Missouri Pacific
flagman owed only the duty of ordinary care to the
People's railway, but the People's railway owed the
duty of the highest possible degree of care to plain-
tiff ; so that, even though the Missouri Pacific may
have performed its duty of ordinary care to the People's
railway, that would not constitute the performance by
the People's railway of its duty of the highest degree
of care to the plaintiff.

MACFARLANE, J.—Plaintiff sued the defendants,
the People's Railway Company and the Missouri
Pacific Railway Company, jointly for $10,000 damages
on account of personal injuries alleged to have been
sustained by her, by reason of their negligence.

In June, 1887, the date of plaintiff's injuries, the
defendant street railway company operated a horse-car
line of street railroad along Fourth street, in the city of
St. Louis, and defendant, the Missouri Pacific Railroad
Company operated a steam railroad along Poplar
street and across Fourth street.　At the Poplar street
crossing of Fourth street, the steam railway company

maintained gates or barriers for the purpose of closing the way along Fourth street to prevent persons from crossing the railroad when dangerous to do so on account of passing trains. It also had a watchman in charge of these gates, whose duty it was to raise and lower them when necessary, and to give warning on the approach of a train. On the day in question plaintiff was a passenger on an open summer car of the street railway going south. On this car there were forty-six passengers. When the car reached Poplar street, being alarmed on account of apparent danger from a collision with an engine on the railroad, plaintiff jumped from the car and was injured.

The charge in the petition against the People's railway was that, in disregard of its duty to its passengers, its agents and servants carelessly drove the car on until it reached the railroad crossing, negligently placed the car in such close proximity to a moving locomotive that a collision seemed inevitable, and plaintiff thus being exposed to great danger, and believing her life to be in peril jumped therefrom in order to free herself from danger. As to the Missouri Pacific Railway Company, the charge was that it was negligent in the management of its gates and locomotive after the peril of plaintiff was discovered, "not having closed its barriers in a timely manner, began and continued to shut down said barriers upon the horses and car in which plaintiff was being carried, causing said barriers to inclose said car and horses carelessly between them and in front of said locomotive," so as to render it seemingly impossible to avoid a collision between the car and the locomotive.

The answer of each defendant was a general denial and a plea of contributory negligence. Judgment was rendered by the circuit court against both defendants, and both have appealed. Each defendant asked an instruction in the nature of a demurrer to the evidence, which was refused, and the principal contention by

defendants here is that the evidence was insufficient to justify the verdict, and the demurrers to the evidence should have been given.

I. It is as well settled as any other principle of the law of negligence that, if one, by the negligence of another, has been placed in a situation of apparent imminent peril, he is not required, in attempting to escape therefrom, to use the judgment and discretion that is required of him when not dominated by terror of impending danger; and if, without having time to deliberate, and acting upon the instinct of self-preservation, and as a prudent person might be expected to act in the circumstances, he is injured by adopting a dangerous alternative, he may still recover from the one by whose negligence he has been impelled to act. This is true, though no injury would have resulted had no attempt to escape been made. Beach on Contrib. Neg., p. 43, and cases cited; Whittaker's Smith's Neg., sec. 392; *Jones v. Boyce*, 1 Stark. 493; *Stokes v. Salstonstall*, 13 Peters, 181; 2 Shearm. & Redf. on Neg., sec. 477.

These are the leading cases in England and this country, and have generally been followed, as will be seen by reference to cases cited by Beach and Smith, *supra*. The principle is well illustrated by numerous adjudged cases. In *Twomley v. Railroad*, 69 N. Y. 160, plaintiff jumped from a moving street car to avoid the apparent danger of a train of cars running on an intersecting railroad. She fell and was injured, but the car passed over the railroad track without a collision. The suit was against the street-car company for negligence in crossing the railroad track in such near proximity to an approaching train. In delivering the opinion the court says: "The peril of remaining in the car was properly judged by the circumstances as they then appeared to the passengers, and not by the result. The fact that the car did pass over safely

cannot reflect upon the action of the plaintiff, and does not prove that she was imprudent or negligent in jumping from the car ; she was compelled to act, and chose the hazard which appeared to be the least, that is, to act upon the probabilities as they appeared at the time.

A traveler, to avoid impending danger from a defective street, leaped from his carriage, and was thereby injured. In a suit for damages against the town, the court says: " Plaintiff, not having come in actual contact with the defect in the highway, it is said that the liability has not attached to the town. But this, we think, is too limited a construction of the statute. The injury to be compensated for by the town is one that has been occasioned by reason of any defect or want of repair in any highway, etc. Such injury to the person may be occasioned by reason of the defect of the highway, when the traveler, being brought suddenly into imminent peril by his near approach to it, in the exercise of ordinary care and prudence, voluntarily leaps from his carriage, and suffers an injury thereby, the circumstances must be such as to justify his conduct, and the defect in the highway must have been the cause of his voluntary act of throwing himself from the carriage." *Lund v. Inhabitants*, 11 Cush. 566.

In the case of *Wesley City Coal Co. v. Healer*, 84 Ill. 129, plaintiff sued the coal company for negligently causing the death of her husband. Defendant was operating certain coal mines in which it had neglected to provide more than one shaft as required by the statute. The plaintiff's husband was a laborer in the mine. A fire occurred in the shaft, smoke was filling the mine and a cry of fire was given ; plaintiff and the other operatives rushed to the shaft, which was the only means of escape. In the rush deceased fell through a shaft into a second mine and was killed. The fire was extinguished and the alarm was unnecessary. The

negligence charged was the failure to provide additional shafts for the safety of the operatives.   In his opinion DICKEY, J., said :   "Had there been a second mode of escape, no such cause of alarm would have existed. Men of ordinary prudence would have felt safe, and been left to exercise their caution in avoiding accidents on their way to a sure mode of escape.   It has long been settled that a   party having given another reasonable cause for alarm cannot complain that the person so alarmed has not exercised cool presence of mind, and thereby find protection from responsibility from damages resulting from the alarm."

From these decisions the following rules, essential to liability may be deduced :   *First*, the peril or alarm must have been caused by the negligence of the one against whom indemnity is sought ; *second*, the apprehension of peril, from the standpoint of the injured person, must have been reasonable, and, *third*, the appearance of danger must have been imminent, leaving no time for deliberation.   On the other hand the danger must be judged by the circumstances as they appear, and not by the result.

II.   Applying these principles to the evidence in this case, was the court justified in submitting the issues to the jury as to whether these defendants, or either of them, were guilty of negligence which exposed plaintiff to apparent impending danger, and whether the apprehension of danger on the part of plaintiff, from her standpoint, was reasonable ?   The following facts were undisputed :   The railroad track, itself a place of danger, passed along a very narrow street.   Where the street-car line crossed the railroad, the view of the track of the railroad to the west was wholly obstructed by buildings until the street car reached Poplar street, within fifteen feet of the track.   Gates or barriers were maintained on each side of Poplar street, to be lowered in order to prevent persons on foot or in vehicles from crossing the railroad track, when dangerous to do so

on account of passing engines and trains. A watchman was in charge of the gates whose duty it was to close the crossing on the approach of a train and to direct and warn persons crossing the railroad. The position of the watchman was on the north side of Poplar street and from his own position he could operate both gates. Poplar street was twenty-one feet in width from curb to curb and about twenty-five feet between the gates. The street car with the team in front was about twenty-five feet in length, also, having barely room for them to stand between the gates.

The evidence then tends to prove, which satisfies the inquiry, that the street car was driven slowly and carefully down to Poplar street without warning or signal from the watchman. When the front of the car had reached a point about opposite the gate, the horses being probably on the railroad track, the watchman "yelled" to the driver to stop, and commenced lowering the gates. The car came nearly or quite to a stop, the gate on the opposite side of the street in front of the car was half way down. At this juncture, when there was clearly apparent danger of a collision with the horses, and when signals of danger had been given in the most emphatic manner, the watchman called out, or "yelled" as one or more witnesses expressed it, "Go on, go on." It appeared then that the horses and car would be inclosed between the gates and across the railroad. The excited language of the guard and the confusion of his orders, taken with the lowering of the gates and the position of the car, would have created in the mind of the most self-possessed apprehensions and alarm. At this moment some one screamed "My God, we will all be killed," and plaintiff turned her eyes to the west and saw an engine approaching on a down grade and within one hundred feet of the car. Immediately, cries arose from persons on the street, and from passengers on the car, such as "look out, look out," "drive on quick," "stop, locomotive is coming."

All became confusion, excitement and terror, and plaintiff with many others jumped from the car. In fact, the engine was barely moving, and was under complete control of the engineer, and no actual danger of a collision existed. This state of facts, from the standpoint of the passengers, certainly tended to prove reasonable cause to apprehend imminent danger of a collision, and that no time or opportunity was afforded plaintiff to deliberate. In adopting the dangerous alternative plaintiff could not, as a matter of law, be declared guilty of contributory negligence. *Siegrist v. Arnot*, 86 Mo. 200 ; *Adams v. Railroad*, 74 Mo. 554.

It is true plaintiff testified that the gateman commenced raising the gate, and the car had started forward before she jumped, and that her attention was first called to the engine by the outcry of one of the passengers. Yet she does not testify at all in reference to other additional facts which were detailed by other witnesses, and which should properly be considered. In view of the fact that the whole occurrence transpired in a few seconds, and in view of her serious injuries, her memory would necessarily be confused and indistinct. But taking her own testimony as conclusive against her in determining the cause of her alarm, we do not think it can be declared as a matter of law, that the fact of lowering the gates, at the time and in the manner shown by her evidence alone, itself a most emphatic declaration of danger, made by one charged with the duty of watching, and to whom plaintiff had the right to look for warning, did not create in her mind reasonable ground for apprehending a collision, which apprehension culminated in terror on seeing the approaching engine.

III. Such ground of apprehension may have existed, however, without the fault of defendants or either of them. The inquiry then arises by whose negligence was plaintiff caused to apprehend danger ?

While it is true that the street-car company was a carrier of passengers, and owed to plaintiff, as a passenger, the highest degree of care practicable in the circumstances, it was not an insurer of her safety, and unless guilty of some negligence would not be liable for her injury.

After a careful examination of the testimony, we are unable to discover any evidence, tending to prove the driver of the street car in any respect wanting in the high degree of care imposed upon him as a carrier of passengers. He drove, as all the evidence shows, slowly and carefully down to Poplar street, checked his speed almost or entirely to stop at a signal from the guard, and no real danger appearing to him, and none in fact existing, he drove across the track. He manifested no excitement, or loss of self-possession which could have been communicated to the passengers. It is true, one or possibly more witnesses testified that he stopped his car on the railroad track. The weight of the evidence was to the contrary, but the evidence of one witness to this fact would have required the submission of the issue to the jury, but for the fact that it appeared, also, from all the evidence that plaintiff had jumped, and her injuries had been received before the car stopped, and the act of stopping the car on the track, if it was done, could not, therefore, have controlled or induced her action.

To properly measure the duty of the street-car driver, the fact must also be kept in view that there was no real danger nor, from his standpoint, appearance of danger. If there had been in fact real danger of a collision, the case might have been different. The negligence of the watchman would not in that case probably have excused the driver from the high degree of care exacted of carriers by passengers, to know and avoid the danger of crossing. *Railroad v. Boyer*, 97 Pa. St. 91. Besides this the gateman was the agent of the railroad company, placed there for the express purpose of

warning and directing those using the street, and of preventing collisions with passing trains, and the driver of the car seeing him at his post of duty had the right to rely and act upon his warnings, signals and directions, in the absence of opportunity, as in this case, to know for himself the situation.   Beach on Con. Neg., p. 199 ; 2 Wood, Ry. Law, 1328 ; *Whelan v. Railroad,* 38 Fed. Rep. 15 ; *Pennsylvania Co. v. Stegemeier,* 118 Ind. 305 ; *Railroad v. Clough* 45 Am. & Eng. R. R. Cases ( Ill.) 137 ; *Central Trust Co. v. Railroad,* 27 Fed. Rep. 159.   On the other hand, while the railroad company only owed to plaintiff the duty of ordinary care in the circumstances, we think it very clear that there was evidence tending to prove a want of such care.   It must be kept in mind that there was no collision, and that the injury was caused by a voluntary leap by plaintiff from the car, to avoid a supposed danger.   The inquiry is whether the evidence tended to prove that the negligence of the gateman caused the condition of terror under which plaintiff was induced to adopt the dangerous alternative.

As has been said, the view of the railroad was wholly obstructed until the car came within the limits of the narrow street upon which the track was laid. The driver and passengers on the car had no means of knowing that the crossing was clear and safe before getting in very close proximity to the track, except from the warnings of the watchman.   Much reliance must have been placed upon his watchfulness, judgment and discretion.   Not until the horses drawing the car were almost, if not entirely, upon the railroad track, was a word or sign of warning given.   At that moment a cry came from him " Stop, stop," and the gates commenced lowering, apparently inclosing the car and horses on the track ; almost immediately, he yelled, " Go on, go on," implying that a desperate alternative of trying to cross the track should be made.   Now when we consider the dangerous locality, we can but say that the confused

and contradictory orders of the watchman, his manifest excitement in giving directions, together with the lowering of the gates when apparently too late for protection, were matters well calculated to excite consternation among the passengers and to create the panic which resulted.

V. Objection was made to the admission of the acts of other passengers, and of outcries made by them and bystanders on the occasion. We think this evidence was admissible as descriptive of the occurrence and as part of the *res gestæ*, and also as evidence that plaintiff was actuated by reasonable apprehension of danger, and not by rashness and imprudence. *Twomley v. Railroad, supra; Railroad v. Ashcraft,* 48 Ala. 15; *Railroad v. Fay,* 16 Ill. 558.

VI. Objections are made to the rulings of the court in giving and refusing instructions. The instructions have been carefully examined, and the action of the court in its rulings thereon is found to be in conformity to the conclusions reached in the consideration of the principles governing the case. These questions need not be further discussed.

Judgment as to the People's Railway Company, reversed, and affirmed as to the Missouri Pacific Railway Company. All concur except SHERWOOD, C. J., and BRACE, J., who concur in reversing as to the People's Railway Company, but dissent in affirming as to the Missouri Pacific Railway Company.

SHERWOOD, C. J. (*dissenting*).—Plaintiff, who is a widow, some fifty-six years of age, and a dress-maker by occupation, brings her suit for damages against both the street-car company and the Missouri Pacific Railway Company, for injuries received by her in consequence of jumping from a car of the former, on which she was a passenger.

Omitting formal portions, the petition is the following: "That on or about the fifteenth day of June, 1887, the defendant, the People's Railway Company,

received plaintiff in one of its cars as a passenger; that said car was proceeding along Fourth street, a public street of said city at a point near Poplar street; that at Poplar street said defendant's track crosses the track of the other defendant, the Missouri Pacific Railway Company; that at the place where said tracks cross each other and on said public street the defendant, the Missouri Pacific Railway Company, has erected certain movable barriers, which it is its duty to close in a careful manner and sufficiently in advance of the approach of its trains, to give timely warning to vehicles and persons traveling upon said Fourth street of the approach of its trains; that when said car on which the defendant, the People's Railway Company, was transporting plaintiff approached said Poplar street a locomotive and a train of defendant, the Missouri Pacific Railway Company, was approaching Fourth street in such a manner as could have been perceived by the employe of the said People's Railway Company, and it became the duty of said defendant to exercise great care in approaching said Poplar street and to avoid collision between its car and the locomotive of said defendant, the Missouri Pacific Railway Company.

"But defendant, the People's Railway Company, in utter disregard of its duty towards its passengers did by its agents and servants carelessly drive said car on until it reached said railway crossing, and placed said car carelessly in close proximity to the moving locomotive of said other defendant as it approached said car, and subjected the limbs and lives of its passengers to great peril; that by reason thereof a collision seemed inevitable and plaintiff being thus exposed to great danger and believing her life to be in peril and deeming it unsafe to longer remain upon said car jumped from the same in order to free herself from said danger, and in so doing broke her leg and otherwise greatly wounded and bruised her person, and received a severe mental shock from being put in such great peril.

" That at the time when said defendant, the People's Railway Company, thus carelessly and negligently drove said car in such close proximity to the moving locomotive of defendant, the Missouri Pacific Railway Company, the latter defendant with great negligence in the management of its said barriers and locomotive, after the peril of plaintiff was discovered, not having closed its barriers in a timely mannner, began and continued to shut down said barriers upon the horses of the car in and upon the car which plaintiff was being carried, causing said barriers to inclose said car and horses carelessly between them and in front of said locomotive which continued to move on toward said car, and cause one of said barriers to become entangled in said car and render it seemingly impossible to prevent a collision between said car and said locomotive, thereby adding to the peril and anguish of plaintiff." Damages in the sum of $10,000 were asked.

The answer of the People's Railway Company or Street Car Company, after interposing a general denial, is as follows : * * * " That any injuries which plaintiff may have sustained on the occasion described in the petition were caused by her own conduct in needlessly and carelessly jumping from said car while the same was in motion at the time and place alleged ; and defendant says that plaintiff would not have been injured in any manner had she retained her seat upon this defendant's car ; and this defendant further says that the alleged injuries, if any, were not caused by the negligence of this defendant or any of its agents or servants as charged in the petition.

" * * * That any injuries which plaintiff may have sustained on the occasion referred to in the petition were caused by the concurring negligence and improper conduct of plaintiff and of defendant, the Missouri Pacific Railway Company, in this : That upon the occasion aforesaid the agent and servant of the

Missouri Pacific Railway Company, whose duty it was to display a signal or close the movable gates on the approach of locomotives or trains of cars at the intersection of Fourth and Poplar streets, failed to give any signal on the occasion referred to in the petition, and also delayed the closing of said gates until this defendant's horse car had already reached near the intersection of Poplar street, and was about to cross the same when he began to lower said gates, and ordered this defendant's driver to go on and cross over the railroad tracks so that he might proceed with the closing thereof, which this defendant's driver did; but in the meantime plaintiff unnecessarily and negligently jumped from said car while said car was still in motion although there was no danger in fact.''

The answer of the Missouri Pacific Railway Company was in effect a general denial, and also a plea that plaintiff's injuries were caused by her own carelessness and negligence, directly contributing to produce the same.

At the time the accident in question occurred, the People's Railway Company operated a line of horse cars on a double track running north and south on Fourth street in the city of St. Louis; the Missouri Pacific Railway Company operated a steam railroad along a single track on Poplar street, running east and west. The tracks of the respective companies intersect each other at Poplar street, and there the Missouri Pacific Railway maintains certain movable gates or barriers which it lowers across Fourth street at the approach of its trains and raises after they have crossed said street. Fourth street is a much traveled thoroughfare. Owing to intervening buildings, approaching trains on Poplar street cannot be seen from Fourth street except near the intersection of the two streets.

The gates operated by the Missouri Pacific Railway company are in the shape of long poles or barriers,

standing upright on the east side of Fourth street when the track is clear, and which are lowered westwardly to a horizontal position across Fourth street when a train is about to cross; they can be thus raised or lowered in one or two seconds; they are in charge of a gatekeeper, employed by the Missouri Pacific Railway Company and under its sole control. There was one such pole on the north and one on the south side of the Missouri Pacific Railway track. These gates or barriers have been in position and were habitually operated by the Missouri Pacific Railway Company for a long time prior to the accident here in controversy, and were relied upon by those operating street cars, and the public generally, in approaching the track of the steam railway as a warning and protection against approaching trains.

Poplar street at the point mentioned is twenty-one feet from curb to curb, and Fourth street forty-nine feet and eight inches at that point between curbs. At the time of the occurrence in controversy, there were some forty-five passengers on the street car, which was an open one, used in the summer time.

In addition to the facts already stated the following, it is believed, will furnish the other salient facts necessary to a proper understanding and determination of the cause: The driver of the horse car on which plaintiff was riding began drawing the brake and "slowed up" as usual about midway of the block as he approached Poplar street going south; he saw no signal and the gates were up; the car then moved on slowly, so slowly, the driver testifies, that he could have stopped it within a space of five feet if he had wanted to. At this time he could not see the Poplar street track west of Fourth street, but he kept his eye on the gatekeeper and the barriers. When the team reached the Poplar street track, and the front platform of the car was about on a line with the northern gate, and not until then, the gatekeeper began to lower the gate over the car, at the

same time hallooing to the driver to go ahead, or hurry up, or words to that effect; at the same time the driver saw a locomotive coming east on Poplar street from the direction of Fifth street,—it was then over half a block away and was approaching very slowly; as the engineer testifies, could have been stopped within a few feet; indeed, its motion was so slow as scarcely to be perceptible; so that some of the witnesses testify, it stood still. There was no train attached to the locomotive, and it is undisputed that it was under complete control.

When the gatekeeper began to lower the north gate over the passing horse car and sang out to the driver to "go on, go on," the latter threw off the brake, started up his team, crossed the railway track and came to a full stop when he had passed, and when the rear of the car was about twenty feet south of Poplar street. After the horse car had crossed and the track was clear, both gates were let down, and the locomotive slowly passed along, crossing Fourth street on its way towards the river.

In the meantime as the street car was about to cross the Poplar street or railway track, a cry of alarm was heard; this it seems came from one of the passengers, who when that point was reached, according to the plaintiff's testimony, raised up and screamed out, "My God, we will all be killed," when she turned, saw the engine coming and jumped from the car, falling in between the tracks of the railroad and receiving the injuries complained of. She was the only passenger injured. Some of the passengers, about ten in number, got off, or jumped off, the car; the others remaining in their seats, among them a lady, Mrs. Peck, who testifies, that as the car got on the railroad track on Poplar street, some one hallooed "Get out of there;" that this sound proceeded from the direction where the flag man stood, *i. e.*, on the northeast corner of the intersection of the two streets; that she sat on the right-hand side of the

car, on the third seat from the front, and did not notice anyone in front of her jump off the car ; that the driver was cool and collected and had his team and the brakes of the car well in hand, and under perfect control, until after they had passed over the railroad track ; that she "did not hear any screams until they *got onto the track;* that she did not jump off the car because she did not *see any reason for doing so,"* that after the driver stopped, or nearly stopped, his car at the northern barrier or gate, he did not stop again until he had driven across the railroad track some twenty feet, and some twenty feet south of it, and when he stopped the car she looked up and saw the engine which was half a block away, or about one hundred and fifty feet.

There was a diversity of opinion as to the distance the engine was away at the time the street car crossed the track, some witnesses giving the distance at forty or fifty feet, some one hundred feet, some thirty to fifty yards ; but the majority, it seems, placed the distance at half a block, and two witnesses who took note of where the engine came to a full stop, at the time the street car crossed the railroad track, and afterwards measured the distance, state that it was one hundred and thirty-five feet. This testimony should certainly have far greater weight than mere hasty surmises or guesses as to the distance of a coming engine. There was a difference of opinion among the witnesses as to whether the car after starting south from the north barrier or gate stopped before it reached a point twenty feet south of the railroad track ; but the preponderance of the testimony is to the effect it did not stop until said last point was reached.

During the examination of witnesses, objections were taken by defendant's counsel, as to how other passengers acted, and as to what they said at the time of the accident.

The above is believed to be a substantial summary of the testimony in the cause.

I. The claim of the People's Railway Company, that its instruction in the nature of a demurrer to the evidence should have been given, is the first point to be considered.

Was that company guilty of negligence warranting a recovery? Certainly the facts in evidence do not seem to disclose any negligence whatever on the part of the driver of the street car. He seems on the contrary to have exercised, in the circumstances disclosed, a degree of care commensurate with the exigency of the situation, and with the duty which a carrier of passengers owes to them. Flagmen or watchmen or gatemen, by whatever name designated, are the agents of the company employing them, and a person approaching a railroad crossing has a right to rely upon either the acts, indications or words of such agents when attempting or about to cross a railroad track, and is not guilty of any degree of negligence in placing such reliance upon the words or verbal acts of such servants of railroad corporations. Beach, Contrib. Neg., p. 199; Wharton, Neg. [2 Ed.] sec. 387; *Lunt v. Railroad*, 1 L. R. Q. B. 277; *Warren v. Railroad*, 8 Allen, 227; Pierce on Railroads, 329, and cases cited. But, of course, any invitation, either express or by signals, on the part of the servants of a railroad company would not authorize an ordinary traveler to recklessly expose himself to patent danger. Pierce on Railways, 329, and cases cited.

The same principle obviously must apply even to carriers of passengers, who with equal necessity must rely upon the vigilance and faithfulness of those servants of railroad companies on whom is cast the duty in our large cities of guarding crossings of the character now under discussion. The case of *Railroad v. Boyer*, 2 Am. & Eng. R. R. Cases, 172, does not at all militate against this view; for there, the driver of the street cart hough beckoned by the flagman of the railroad

company to "come on," yet at the same time he was expressly warned of the danger by a passer-by, but in spite of this warning and of an unobstructed view of the railroad track, which he might have had, ventured to attempt to cross the same ; in which case it was properly held that his act was one of gross negligence.   See note to that case.

The facts heretofore stated bring this case fully within the operation of the principle already asserted, since the driver of the street car had no opportunity of seeing the whereabouts of the engine, and, therefore, had the right to rely in all confidence upon the acts and commands of the flagman at the time they were given, and to continue his car in motion even after he saw the slowly approaching engine ; for assuredly there was nothing either in the appearance or nearness of that engine to give any token whatever to his practiced eye of impending danger ; moreover, he had the right to presume that the engineer would so operate his engine that the street car would not be struck by it.    *Peck v. Railroad*, 50 Conn. 379.    Taking this view of the point, it must be ruled that the evidence in this cause establishes no liability whatever against the People's Railway Company, and that in consequence of this the instruction asked by that company, in the nature of a demurrer to the evidence, should have been given.

II.    The next point for consideration is the duty the Missouri Pacific Railway Company owed to the plaintiff.    This duty obviously was not of such a high nature and extraordinary character as that owed by a carrier to its passengers ; but only a duty measured by the term "*ordinary care.*"   Beach, Contrib. Neg., pp. 153, 190, 191, 195 ; *Doss v. Railroad*, 59 Mo. 27 ; *Dougherty v. Railroad*, 97 Mo. 647.    That care of this sort was exercised by the Missouri Pacific Railway Company, so far as concerned the management of its *engine,* is conceded by the instructions asked by the

plaintiff and given by the court.  It stands confessed then upon this record that no negligence is imputable to that company by reason of its engine pursuing its accustomed course on that occasion.

III.  The only question then left remaining is whether the Missouri Pacific Railway Company was guilty of actionable negligence in respect of the management of its gates by its watchman.  In order for the plaintiff to recover against that company, it must appear not only that that company was guilty of negligence in relation to its gates, but that such negligence directly occasioned the injury complained of.  Now, if the engineer was guilty of no negligence in the management of his engine, keeping it as he did almost stationary and under perfect control, it would seem that the gate-keeper was not negligent in ordering the driver of the street car to do that which he might do and did do in perfect safety.

But granting that the gatekeeper was negligent, by what standard shall his negligence be measured?  Was anything more due from him than as the representative of his employer, *i. e.*, "ordinary care?"  But granting further that the same high degree of care was due to plaintiff from the gatekeeper in his representative capacity, that is due by a common carrier to its passengers, upon what sound or rational basis can the liability of the Missouri Pacific Railway company be placed?  In order to ascertain this it is proper to consult and to consider the authorities, and this will be presently done.  Meanwhile, it will be conceded that the exclamations made by the fellow passengers of the plaintiff at the time she jumped off the street car and fell upon the railroad track were competent evidence being part of the *res gestœ;* for this is shown by abundant authority cited by her counsel.

It will be conceded, also, for so are all the authorities, that if a person is placed in a situation of peril by

the negligent act of another, and, in order to avoid that peril he adopts a perilous alternative in endeavoring to escape imminent peril, that then such endeavor will not constitute contributory negligence, if the danger be brought about by the defendant's negligence, provided that the act done was such as ordinarily prudent persons might have been expected to do in like circumstances, even though the injury would not have happened if the attempt to escape had not been made. Beach, Contributory Neg. 43–44, and cases cited; Whittaker's Smith's Neg. 392, and cases cited; Story on Bailments [9 Ed.] sec. 598, and cases cited.

But it must be borne in mind that in order to justify such incurring of a new peril in the endeavor to avoid a former one there are two essentials to a recovery : *First*, the position from which escape is sought must be one of imminent or apparently imminent danger, such as admits of no delay in taking action, and such as would in like circumstances naturally arouse the fears of a person of ordinary prudence and self-possession; *second*, the fault of placing the party injured in such perilous position must rest with the defendant, and be directly occasioned by his negligence.

This view is very well illustrated by an early case on the subject, where Lord ELLENBOROUGH, in charging the jury, said : "To enable the plaintiff to sustain the action it is not necessary that he should have been thrown off the coach ; it is sufficient if he was placed, by the misconduct of the defendant, in such a situation as obliged him to adopt the alternative of a dangerous leap, or to remain at certain peril ; if that position was occasioned by the default of the defendant, the action may be supported. On the other hand, if the plaintiff's act resulted from a rash apprehension of danger, which did not exist, and the injury which he sustained is to be attributed to rashness and imprudence he is not entitled to recover. * * * A coach proprietor

certainly is not to be responsible for the rashness and imprudence of a passenger ; it must appear that there existed a reasonable cause for alarm." *Jones v. Boyce,* 1 Star. 483.

That case was approvingly followed in that of *Stokes v. Saltonstall,* 13 Pet. 181, which presented similar features of fact for adjudication. *Jones v. Boyce, supra,* was followed in *Ingalls v. Bills,* 9 Met. ( Mass.) 1, and the point ruled the same way. There, the words, "*reasonable precaution*" and "*prudent precaution,*" were applied to the act *of leaping from a stage coach, where an axletree had broken and a hind wheel came off, causing the coach to settle down on one side as if about to be overset. These early cases in England and this country are generally followed and the substance of the rulings in them is given in the formula above stated. Occasionally, perhaps, there may be found departures from that formula ; but the great current of authority flows in the direction heretofore indicated.

Thus in *Coulter v. Express Co.,* 56 N. Y. 585, the plaintiff was walking upon the sidewalk when an express wagon of the defendant company driven rapidly upon the sidewalk came so quickly up behind her that she had no time to look around, but instinctively sprang aside to escape the impending danger, and, in so doing, struck her head against a wall receiving injuries, and it was ruled in affirmance of the judgment, *that, if she had time to look around before jumping in order to discover the cause of her sudden alarm, it was her duty to do so ;* otherwise her instinctive effort to avoid the danger would not defeat her right to a recovery, nor diminish the defendant's previously incurred responsibility arising from his negligent act.

The case of *Twomley v. Railroad,* 69 N. Y. 158, much relied on by plaintiff, was of this nature : The plaintiff was a passenger on a street car, the route of

which crossed a railroad track. Just as the street car approached that track, upon which an express train was approaching with the speed customary to such trains, the driver stopped to allow a passenger to alight. Had he remained stationary, the train could have passed; but he recklessly whipped up his horses and drove on the railroad track in front of the fast moving train. All of the passengers in the car, with one exception, perceiving the danger, rushed out and jumped from the car; the plaintiff in doing so fell and was injured, and the car passed over the track just in time to escape the engine, which the engineer, by promptly reversing and by putting on brakes, barely succeeded in preventing a collision with the car, and the plaintiff was held entitled to recover; the propriety of which decision cannot be doubted, since all the elements of a great and impending peril were present; a peril produced by the recklessly negligent act of the street-car driver; a peril, too, well calculated to disconcert the highest self-possession and appal the stoutest heart.

The case of *Buel v. Railroad*, 31 N. Y. 314, is one of similar sort. There, a passenger on a train, which was proceeding west, saw another train coming *on the same track*, towards the one on which he was at an unusual rate of speed, *i. e.*, about twenty-five miles an hour. Strenuous efforts were made by reversing the engine attached to the plaintiff's train to avert a collision, but without avail, for the collision occurred, driving the cars of one of the trains from forty to sixty rods over the ties killing one man on the eastward bound train, jamming up the westward bound train and breaking off some of the platforms of the cars. Upon seeing the approaching train and men jumping from other cars to avoid impending danger, the plaintiff left his seat, rushed to the forward door of the car, and stepped one foot upon the platform at the instant of the collision, and of his injury. And it was held that the

railway company was guilty of the grossest negligence in allowing the collision to occur in the circumstances there stated, and of the plaintiff it was aptly said: "His act was not the result of a rash apprehension of danger that did not exist." Other cases instanced for plaintiff announce the same principle. But it is believed that those cases do not parallel the present one in its salient facts and features.

Here, according to the plaintiff's own statement which is an admission as well as testimony, neither the acts of the gatekeeper in raising or lowering his gates, nor his words to the driver to "go on, go on," excited any alarm in her breast; and she only became alarmed "when the driver got to the Poplar street track or about there (and) some one raised up and screamed out, 'My God, we will all be killed,' when she turned, looked, saw the engine coming, and jumped from the car."

But the engine and its management as already indicated have been entirely eliminated from this case, as factors of negligence. There was no mismanagement in any respect about it. It is evident beyond dispute from plaintiff's own testimony that she made that engine the main element of her hasty action, and but for its presence on that occasion she would not have jumped from the car. The question then arises, do the facts in this case resemble those from which quotations have already been approvingly made, or do they not indicate on the part of the plaintiff not a "reasonable precaution" in acting as she did, but rather "a rash apprehension of danger which did not exist" *Jones v. Boyce, supra.*

It would seem from both authority and reason that the answer to this question must be one unfavorable to the plaintiff; for it cannot be claimed that any real or any apparently imminent danger existed, such as would, under the authorities quoted, authorize or justify the plaintiff's inconsiderate and imprudent action.

Certainly even a common carrier is not responsible in damages for the consequences growing out of a sudden, senseless and unfounded panic; and by the stronger reason the Missouri Pacific Railway Company, owing only to plaintiff the duty of ordinary care, would not be responsible for such consequences.

In some respects this case resembles that of *Peck v. Railroad, supra,* where a husband drove out with his wife in a phaeton on a street that crossed a railroad track. In endeavoring to go through the gate which protected that track, the wheel of the phaeton was momentarily caught in the gate as it swung to be closed, just as the husband attempted to drive through, but the wife, becoming alarmed at the sight of the engine and the attempted closing of the gates, sprang out and was injured. The husband drove safely across the track, and it was held that the act of the wife in jumping out was needless, CULVER, J., remarking: "If Mrs. Peck had remained in the carriage she would have passed safely across, as did her husband. She *misjudged.* She was in no real danger, and there was no more reason for her jumping out of the carriage than there was for her husband. She could see the locomotive, and might have known as well as her husband that the engineer would not start his train so long as the team was in danger of being struck by it." Other cases may be instanced, where, upon facts substantially similar in their bearing and effect, similar judicial conclusions have been reached.

Thus in *Railroad v. Wallen,* 65 Tex. 568; 26 Am. & Eng. R. R. Cases, 219, the "plaintiff and his wife were passengers on a train on defendant's road which stopped between two stations and remained standing for about an hour. While the train was so standing another passenger called out: 'Here comes a train right on us.' Other passengers jumped to their feet and scrambled to get out of the car door. Plaintiff looked through the

rear door and saw a freight train coming toward the passenger train and about three hundred or four hundred yards off. He called to his wife and both ran to the car platform and jumped to the ground. His wife was seriously injured. He did not look back again until he had reached the ground, when he saw the freight train one hundred yards in the rear, having stopped. There was evidence to show that nearly all the passengers were frightened. There seemed to be a general panic, and many of the passengers jumped to the ground. The conductors of the two trains testified that there was no danger whatever of a collision, as the freight train had been properly signaled, as soon as it came in sight. Three of the passengers testified that they saw the freight train coming and apprehended no danger; that it seemed to be under control, and was running slowly. In an action by plaintiff to recover damages for the injuries received by his wife in jumping off the train it was held that the evidence would not sustain a verdict for plaintiff, and the defendant could not be held guilty of any act of negligence contributing to the injury of plaintiff's wife.

ROBERTSON, J., in delivering the opinion of the court says: "The defendant neither caused nor contributed to the injury of plaintiff's wife unless it allowed the freight train to come so near to, or so rapidly toward, the passenger coach as to frighten the passengers. It does not appear from the testimony that a single one of those who leaped from the train, except the plaintiff, saw the freight train coming. When plaintiff saw it, it was three hundred or four hundred yards distant, and, as he says, appeared to be moving rapidly. He does not state that he supposed from what he saw there would have been a collision. No one left the train upon his own perception of danger. On the contrary, those who used their senses felt no alarm, and remained in the cars. Whatever may have been the

speed of the train when three hundred or four hundred yards distant, it was slowed to a full stop at least fifty yards from the passenger coach. There was, therefore, no actual danger." Of a similar import is the case of *Railroad v. Felton*, 33 Am. & Eng. R. R. Cases, 533.

From the premises of fact and of law aforesaid, these conclusions must be drawn: That the plaintiff has established no cause of action against the Missouri Pacific Railway Company; that there was no real danger and no such imminent danger as would, under the authorities quoted, justify her rash act and cast the responsibility for it on that company.

It follows from this that it is unnecessary to discuss the instructions in detail, and that the judgment as to that company also should be reversed.

The foregoing statement and opinion which were filed by me in division number 1, I refile as a dissenting opinion to the opinion of the court *in banc*, in so far as that opinion differs from this one. BRACE, J., concurs.